IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Action No. 1:17-cv-03003-LTB

JESSICA L. MEDINA,

       Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner of Social Security,

       Defendant.

---

## ORDER

---

Plaintiff Jessica L. Medina appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability insurance benefits, filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., and her application for supplemental security income, filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383c. Jurisdiction is proper under 42 U.S.C. § 405(g). Oral argument would not materially assist me in the determination of this appeal.

After consideration of the parties' briefs, as well as the administrative record, I REVERSE and REMAND the Commissioner's final order for further proceedings.

## I.  STATEMENT OF THE CASE

Plaintiff is a 48 year-old woman with a GED and some specialized schooling. [Administrative Record ("AR") 248, 285] She seeks judicial review of SSA's decision denying her applications for disability insurance benefits and supplemental security

income. Pl.'s Br., ECF No. 13 at 1–2. Plaintiff filed her application for disability insurance benefits in June 2014 alleging that her disability began in September 2009 and her application for supplemental security income in September 2014 alleging that her disability began in February 2013. [AR 221, 225]

The applications were initially denied on October 30, 2014. [AR 156, 160] After Plaintiff's request for review, the Administrative Law Judge ("ALJ") conducted an evidentiary hearing and issued a written ruling on October 18, 2016. [AR 32–45, 51–98] In that ruling, the ALJ denied Plaintiff's application on the basis that she was not disabled because, considering her age, education, work experience, and residual functional capacity, Plaintiff could perform jobs existed in significant numbers in the national economy. [AR 44]

The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination, making SSA's denial final for the purpose of judicial review. [AR 1–4]; 20 C.F.R. §§ 404.981, 416.1481. Plaintiff timely filed her Complaint with this court seeking review of SSA's final decision. ECF No. 1.

## II.    Relevant Medical History

Plaintiff's claims on appeal relate to her mental health and her neck, back, and arm. Her injuries mainly stem from an assault that occurred in 2009 where she was severely injured in her home. [AR 828–30]

A month after the assault, Plaintiff visited the Summit Medical Clinic where she was examined by Todd Knauf, PA. [AR 659–61] Plaintiff noted numerous

maladies including: memory loss; severe, infrequent headaches; severe neck pains; numbness and tingling in her right arm; and trouble sleeping. [AR 659] Mr. Knauf noted that Plaintiff had a decreased range of motion in her neck and appeared mildly distressed. [AR 660] He assessed Plaintiff with severe neck pain, severe headaches, numbness and tingling in her right arm, and right arm pain. [AR 660–61] A neurologist diagnosed her with a concussion. [AR 673]

In March and June 2010, Mr. Knauf added diagnoses of anxiety and depressive disorder and advised her to seek counseling. [AR 683, 690] In December, Plaintiff presented symptoms of chronic nausea and headaches and acute vomiting and Mr. Knauf ordered an MRI of her brain. [AR 701–02] Plaintiff returned a few weeks later, reporting another assault and was diagnosed with cervicalgia and lumbago—neck and lower back pain. [AR 707] A radiology report from that month read that Plaintiff had mild degenerative changes in her cervical and lumbar spine. [AR 888–89]

In January 2011, Plaintiff complained of continued fatigue and depression, but was afraid to take depression medication prescribed to her. [AR 718] An MRI showed minimal changes when compared to a 2009 MRI. [AR 354] In May, Mr. Kanuf diagnosed Plaintiff with vertigo. [AR 730] In July, Plaintiff began therapy at Aspen Pointe with Lyndsay Ross, PsyD writing that Plaintiff felt as though she was having a nervous breakdown and social anxiety. [AR 360]

In January 2012, Dr. Ross noted that Plaintiff had been feeling more emotionally stable, but reported continued issues with family. [AR 464] That same

month, Plaintiff reported to Mr. Knauf moderate right arm pain that did not limit

daily activities and chronic depression. [AR 742] In March, Pratheep Arora, MD of

Summit Medical Clinic prescribed Plaintiff Xanax for anxiety and noted acute

anxiety due to familial issues. [AR 404] In August, Dr. Ross wrote that Plaintiff

reported that

> she has been avoiding problems in her life by isolating inside her house
> and avoiding social contact as well as several of her responsibilities. She
> reports her depression has decreased somewhat in intensity over the
> past 6 months, but that her anxiety and irritability are still very high.
> She states that she feels the way she did two years ago when she first
> initiated mental health treatment.

[AR 470]

In October, Plaintiff visited Summit Medical Center, where her medicine for

depression and anxiety was increased and she was prescribed medicine for muscle

spasms in her shoulder. [AR 410] One month later, Plaintiff continued to experience

neck and shoulder pain and was ordered to have an X-ray of her neck. [AR 411–12]

In January 2013, Plaintiff presented to Maninder Bali, MD that she had

stress dealing with people, poor memory when anxious, and excessive worrying. [AR

475] Dr. Bali noted a restricted affect, better mood, and an otherwise unremarkable

psychiatric exam, but increased Plaintiff's prescription for Zoloft, continued her on

Xanax, and started her on Prasozin. [AR 476–77] In March, Plaintiff reported to Dr.

Bali that she was fired from her job and that she had severe pain in her neck. [AR

481] Dr. Bali increased her Zoloft prescription. [AR 483]

In April, Plaintiff reported continued pain in her neck and Dr. Arora ordered

an MRI of her cervical spine. [AR 415] That MRI showed mild to moderate disc

degeneration in parts of her spine and severe disc degeneration in other parts "with mild cord flattening by disc osteophyte." [AR 352–53]

In May, shortly after the MRI, Dr. Bali noted that Plaintiff still had depression and low energy with severe pain in her neck and back that made "her daily work impossible to be done." [AR 488] Dr. Bali added a prescription for Wellbutrin. [AR 490] Through June and July, Plaintiff continued her pain management with Dr. Arora. [AR 420–23]

In August, Dr. Bali wrote that Plaintiff had nightmares related to the anniversary of her assault and that post-traumatic stress disorder made her unable to work. [AR 495] In September and December 2013 and March 2014, Plaintiff reported to Dr. Bali that she had no concerns and her mood was stable and Dr. Bali renewed her medication. [AR 502, 504, 509, 515]

In June, Plaintiff saw Jay Balestrieri, NP, who noted neck and arm pain. [AR 379] In July, Dr. Bali noted that Plaintiff was "[q]uite depressed" and increased her medication. [AR 523] In August, Plaintiff had an X-ray of her right shoulder with no remarkable findings, but that pain continued into September. [AR 584, 765] Dr. Bali wrote that Plaintiff was still doing well on her medication regime, but added an adjunct to assist with obsessive compulsive disorder and depression. [AR 608] After Plaintiff had an MRI on her shoulder, Mr. Knauf assessed her with cervicalgia and cervical radiculopathy. [AR 768]

Shortly thereafter, Victor Nwanguma, MD performed a consultative exam on Plaintiff. [AR 589] Dr. Nwanguma wrote that Plaintiff was awake, alert and in no

acute distress. [AR 590] He diagnosed Plaintiff with "[c]ervical spinal stenosis, chronic with right upper extremity radiculopathy." [AR 592] He provided a functional assessment where he wrote that Plaintiff "may have frequent limitation performing activities requiring use of the right upper extremity due to radiculopathy from cervical spinal stenosis;" limited her to carrying 50 pounds occasionally and 25 pounds frequently; and suggested occasional limitation with reaching, handling, fingering, and feeling. [AR 592–93]

In November, Plaintiff reported continued shoulder and neck pain alongside dizziness. [AR 772] Dr. Arora added medicine for the dizziness. [AR 773] A lumbosacral spine X-ray lead to an impression of mild spondylosis and facet joint arthropathy. [AR 776] Dr. Arora assessed Plaintiff with cervical radiculopathy. [AR 777]

In December, Plaintiff saw Dr. Bali and cried throughout the interview, where she noted stress regarding her family and asked for medicine to control her insomnia. [AR 612–14] Mr. Knauf assessed Plaintiff was spinal stenosis in her cervical region and restarted her on hydrocodone. [AR 786]

In January and May 2015, Plaintiff reported no concerns to Dr. Bali and she planned on continuing her regimen. [AR 619–21, 626] Plaintiff again reported to Mr. Knauf neck and shoulder pain and Mr. Knauf assessed her with cervical degenerative disc disease. [AR 790] In March she was assessed with spinal stenosis in her cervical region and in April, she was assessed with cervicalgia. [AR 795]

In June 2015, Plaintiff established care with Value Care Health Clinic, where

it was noted that her depressive disorder was chronic but well controlled and that her cervical spine stenosis was chronic and unchanged. [AR 897] Plaintiff reported it to be stable, but it was noted that she had slight right arm and hand weakness. [AR 899–900] Through July and August, Plaintiff's pain continued, but was controlled, and additional MRIs were ordered. [AR 901–09] In September, Plaintiff began therapy after being retraumatized when she witnessed an assault. [AR 114] Tracy Kinsley, LPC noted an unremarkable mental status exam. [AR 114–15] Ms. Kinsley saw Plaintiff over the next few months and showed some improvement, but eventually stopped going. [AR 126] In September, Dr. Bali reported that Plaintiff was stable, but was sleeping poorly. [AR 632]

In December, Michael McKisic, MD evaluated Plaintiff and wrote that she had

> an MRI demonstrating central canal neural foraminal stenosis, most notably at C5-C6, but also at C6-C7. This is not causing any cord compression or signal change in the cord. The C5-C6 stenosis is more on the right. Her cervical spine is straight and very slightly kyphotic. In terms of her neurologic examination, she is essentially intact, except for some slight numbness to pinprick over the lateral aspect of her right forearm and dorsum of her hand.

[AR 927]

Dr. Bali wrote that Plaintiff planned to have surgery for her diagnosis of cervical stenosis and that she felt "very depressed all the time." [AR 638] At Value Care Health Clinic, Plaintiff reported that she was unable to walk or stand for long periods of time. [AR 910] She was diagnosed with lumbago and X-rays were ordered, which showed advanced degenerative disc disease. [AR 913, 919]

In February 2016, Plaintiff reported to Dr. Bali that she was feeling great on

her current regimen. [AR 644] In March, Plaintiff was seen again by Dr. McKisic who noted her symptoms were worsening and suggested a two-level discectomy and fusion surgery. [AR 947] However, Plaintiff eventually stated that she was afraid to have surgery and was referred to physical therapy. [AR 914–16] In May, Dr. Bali noted that Plaintiff's obsessive behaviors were increasing and she modified her medication. [AR 652]

In December, Anthony Ricci, PhD performed a psychology evaluation on Plaintiff. [AR 20–30] Dr. Ricci concluded that

> Based on her clinical presentation. history, and screening psychological testing, it is my opinion within a reasonable degree of psychological certainty that Jessica Medina is continuing to manifest unresolved, and probably consolidated, mild PTSD features associated with the assault in 2009. There are chronic and acute elements in her presentation with trauma rekindling as a major consideration in light of her vulnerability.

[AR 29] Dr. Ricci stated it was "very evident" that Plaintiff required surgery regarding her neck and arm issues and opined that Plaintiff needed psychological assistance involving her decisions regarding the surgery. [*Id.*] Dr. Ricci concluded that Plaintiff was significantly impaired in her ability to perform daily activities and routines and that without improvement she would not be able to perform competitive employment tasks. [AR 29–30]

### III.    LEGAL STANDARDS

#### A.  SSA's Five-Step Process for Determining Disability

A claimant is "disabled" under the Social Security Act if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). SSA has established a five-step sequential evaluation for determining whether a claimant is disabled and thus entitled to benefits. 20 C.F.R. §§ 404.1520, 416.920.

At step one, SSA asks whether the claimant is presently engaged in "substantial gainful activity." *Id.* If she is, benefits are denied and the inquiry stops. 20 C.F.R. §§ 404.1520(b), 416.920(b). At step two, SSA asks whether the claimant has a "severe impairment"—that is, an impairment or combination of impairments that "significantly limits [her] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). If she does not, benefits are denied and the inquiry stops. If she does, SSA moves on to step three, where it determines whether the claimant's impairments "meet or equal" one of the "listed impairments"— impairments so severe that SSA has determined that a claimant who has them is conclusively disabled without regard to the claimant's age, education, or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). If not, SSA goes to step four.

At step four, SSA determines the claimant's residual functional capacity ("RFC")—that is, what she is still able to do despite his impairments—and asks whether the claimant can do any of her "past relevant work" given that RFC. 20 C.F.R. §§ 404.1520(e), 416.920(e). If not, SSA goes to the fifth and final step, where it has the burden of showing that the claimant's RFC allows her to do other work in the national economy in view of her age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g).

In contrast with step five, the claimant has "the burden of establishing a prima facie case of disability at steps one through four." *Doyal v. Barnhart,* 331 F.3d 758, 760 (10th Cir. 2003).

### B. Standard of Review

My review concerns only whether SSA's factual findings are supported by substantial evidence and whether the correct legal standards were applied. *Vigil v. Colvin*, 805 F.3d 1199, 1201 (10th Cir. 2015). With regard to the law, reversal may be appropriate when SSA fails to apply proper legal standards. *Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014) (quoting *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994)). With regard to the evidence, I must "determine whether the findings of fact . . . are based upon substantial evidence, and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970).

"Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). The record must demonstrate that the ALJ considered all the evidence, but an ALJ is not required to discuss every piece of evidence. *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). I examine the record as a whole and may not reweigh the evidence or substitute my judgment for that of the ALJ. *Flaherty v. Astrue*, 515 F.3d at 1070.

## IV.  THE ALJ'S RULING

In his ruling, the ALJ followed the five-step analysis outlined *supra*. The ALJ concluded under the first step that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of February 22, 2013. [AR 37] Under step two, the ALJ determined that Plaintiff had the severe impairments of post-traumatic stress disorder ("PTSD"), major depressive disorder, anxiety, degenerative disc disease of her cervical spine, and obesity. [*Id.*]

The ALJ concluded under step three that the enumerated severe impairments did not meet or medically equal an impairment in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (the "Listing"). [AR 38] The ALJ found that Plaintiff had the RFC to perform sedentary work except that she was limited in that she

> should never be required to climb ladders, ropes, or scaffolds. She is able to occasionally climb ramps and stairs, balance, stoop, crouch, kneel, and crawl. The claimant is further limited to occasional, bilateral, overhead reaching. She is able to frequently handle and finger, bilaterally. The claimant is further limited in that she must avoid frequent exposure to excessive vibration, and must avoid frequent use of moving and/or dangerous machinery, and frequent exposure to unprotected heights. The claimant is further limited to work that consists of only simple, routine, and repetitive tasks, and to work in a low stress job, defined as not requiring the worker to cope with work-related circumstances that could be dangerous to the worker or others. She is able to maintain sufficient attention and concentration for extended two-hour segments during a normal workday, with normal breaks, but only in work that consists of no more than simple, routine, repetitive tasks. She [is] further limited to work that requires no more than occasional interaction with the public, and to work that requires frequent interaction with co-workers. She is further limited to work that requires only occasional supervision, defined as requiting a supervisor's critical checking of her work.

[AR 40]

The ALJ found that Plaintiff was unable to perform her past relevant work—

which included working at a temp agency, as a cashier, in security, at an insurance agency, and at a bar—fulfilling step four. [AR 43, 248] In the fifth and final step, the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform. [AR 44] The ALJ supported his decision based in part by the testimony of the vocational expert and related hypotheticals, and found that Plaintiff could be a hand painter-stainer, escort vehicle driver, and document preparer. [AR 44–45] Thus, the ALJ concluded that Plaintiff was not disabled. [*Id.*]

## V.     ISSUES ON APPEAL

In appealing the ALJ's decision, Plaintiff argues that her RFC was incorrectly formulated by improperly weighted opinion evidence, that additional evidence submitted to the SSA Appeals Council should be considered, and that the ALJ improperly assessed the consistency of Plaintiff's statements.

### A. Weighing medical opinions

Plaintiff argues that the ALJ's determination of her RFC was not based on substantial evidence. ECF No. 16 at 12. She disputes the analysis or weight given to the opinions of Dr. Bali, Dr. Arora, Mr. Knauf, Dr. Enright, and Dr. Ricci. *Id.* at 12–24.

In determining a claimant's RFC, the ALJ uses "all of the relevant medical and other evidence." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). Part of the medical evidence considered are opinions from acceptable medical sources. 20 C.F.R. §§ 404.1527, 416.927.

An ALJ must consider every medical opinion and discuss the weight he assigns to the opinion. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir.

2012). Specific factors to consider include: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Watkins v. Barnhart*, 350 F.3d 1297, 1300–01 (10th Cir. 2003); 20 C.F.R. § 404.1527(c).

While the ALJ need not explicitly discuss each individual factor, *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007), the ALJ must "give good reasons in the notice of determination or decision for the weight he ultimately assigns the opinion." *Watkins v. Barnhart*, 350 F.3d at 1301.

### 1. Dr. Bali

Plaintiff argues that the ALJ improperly gave Dr. Bali's opinion only partial weight. ECF No. 16 at 21. Plaintiff argues that since Dr. Bali was Plaintiff's treating psychiatrist who had seen Plaintiff for about two years, she should have been afforded greater weight. *Id.* at 22.

Defendant counters that the length of time a treating relationship has existed is "but one of many considerations relevant to the weight due a medical opinion, and the ALJ here found that Dr. Bali's treatment notes simply failed to support the extreme limitations that the doctor suggested Plaintiff experienced."

ECF No. 20 at 15.

The ALJ gave Dr. Bali partial weight because the opinion was not consistent with Dr. Bali's findings described in her examinations. [AR 42] The ALJ recounted Plaintiff's mental impairment allegations and reviewed Dr. Bali's records. The ALJ wrote that

> [I]n January 2013, the claimant reported a better mood, but had a constricted affect. Dr. Bali noted she had normal speech, goal-oriented thought process, no abnormalities in thought content or perceptions, and fair insight, judgment, and cognition. [She] further indicated that the claimant was not gravely disabled. The claimant reported on February 20, 2013 that she had low level[s] of depression until her anxiety and irritability increase[d], which increase[d] her symptoms of depression. She rated her anxiety 7/10. She also stated that she quit working because she did not want to be around others.

[AR 42 (internal citations omitted)] The ALJ added that "[a]s to her mental impairments, the claimant has not sought counseling since May 2014, which is not consistent with disabling symptoms." [AR 43]

Plaintiff disputes this reasoning by pointing to Dr. Bali's explanation of her treatment history with Plaintiff. Plaintiff's counsel interviewed Dr. Bali, where she confirmed that she had been Plaintiff's psychiatrist for one-and-a-half to two years. [AR 101] She stated that Plaintiff's conditions were unpredictable because she would see improvement in mood, but Plaintiff's "depression and her insomnia are something very difficult to treat, and she has failed some [medications]." [AR 102] Dr. Bali noted that she thought that Plaintiff was truthful in her statements and she explained her diagnoses. [AR 101–02] She added Plaintiff's condition was a "like a cycling process" where Plaintiff would do well, but then she would be severely depressed for a few months. [AR 104]

14

Plaintiff also points out that she has indeed sought counseling past 2014. Indeed, Dr. Bali stated in August 2016 that she had seen Plaintiff in July for treatment and that she expected treatment to continue. [AR 101] Additionally, as discussed *supra*, Plaintiff sought counseling for a few months in late-2015 where she showed some improvement, but eventually stopped going. [AR 126] This evidence of Plaintiff's additional therapy was submitted to Defendant after the ALJ's review. [AR 2] The SSA Appeals Council found that the evidence did "not show a reasonable probability that it would change the outcome of the decision." [*Id.*]

I am to take this additional evidence into account in my review of the record. *Vallejo v. Berryhill*, 849 F.3d 951, 954 n.1 (10th Cir. 2017) ("When a claimant submits new evidence to the Appeals Council and the Council accepts that evidence, it becomes part of the administrative record for the district court to consider in performing its substantial-evidence review.") (citing *O'Dell v. Shalala*, 44 F.3d 855, 858–59 (10th Cir. 1994)).

Defendant argues that the ALJ was reasonable in his analysis because Dr. Bali's "treatment records documented fairly consistent findings of a restricted affect but a good mood, cooperative demeanor, normal speech, goal oriented thought processes, and fair insight, judgment, and cognition." ECF No. 20 at 15–16.

However, I agree with Plaintiff that Dr. Bali herself spoke to this distinction in her interview with Plaintiff's counsel, when she stated Plaintiff would fluctuate in her mental state. My review of the records, noted *supra*, highlight that this

fluctuation did indeed occur. This fact, coupled with Plaintiff's additional counseling past the date mentioned by the ALJ, means that the ALJ should reconsider the weight he gave to Dr. Bali's opinion.

### 2. *Dr. Arora and Mr. Knauf*

Plaintiff argues that the ALJ improperly weighed the opinions of Dr. Arora and Mr. Knauf. ECF No. 16 at 20. Plaintiff alleges that the ALJ offered his own medical opinion in contravention of the law and that the opinions of Dr. Arora and Mr. Knauf were consistent with other medical evidence in the record. *Id.* at 20–21.

In his decision, the ALJ gave no weight to the statement in November 2014 from Mr. Knauf that indicated that Plaintiff was unable to work for more than two hours at a time due to severe neck pain. [AR 42] The ALJ supported this decision by noting that the exam accompanying the statement "only noted moderate tenderness, which is inconsistent with an inability to work for more than two hours at a time." [AR 42–43]

However, the exam report was more thorough than that. Plaintiff presented to Mr. Knauf with dizziness, described as "lightheadedness, faintness, a spinning sensation and loss of balance." [AR 772] Additionally noted was Plaintiff's description of neck and shoulder pain. [*Id.*]

Discussed *supra*, in the months preceding his opinion, Mr. Knauf (with consistent co-signing by Dr. Arora) assessed Plaintiff with cervicalgia and cervical radiculopathy, noting moderate tenderness in her cervical spine. [AR 768] Multiple X-rays and MRIs were ordered and neck and joint pain were consistently noted. [AR

765–77] Weeks after Mr. Knauf's statement, Mr. Knauf noted that Plaintiff had numbness and tingling in both hands related to cervical radiculopathy. [AR 777]

To summarily give no weight to Mr. Knauf's statement without further explanation of the context surrounding his statement leads me to believe the weight given to the ALJ was not supported by substantial evidence. *Cf. Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) ("In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion."). As such, the ALJ must reconsider the medical evidence regarding the weight given to Mr. Knauf's statement.

### 3. *Dr. Enright*

Plaintiff argues that the evidence shows that the ALJ was wrong to afford Dr. Enright's opinion great weight. Plaintiff contests the reliability of Dr. Enright's opinion because Dr. Enright did not perform a psychological interview, consultation, or any psychiatric or psychological testing of Plaintiff. ECF No. 16 at 13.

The ALJ gave great weight to Dr. Enright's opinion, as he was "the only medical source to review the entire medical record and listen to the claimant's testimony." [AR 43] The ALJ noted Dr. Enright's analysis of Plaintiff's mental impairments and further noted that Dr. Enright "declined to assess the claimant's functional limitations, citing the lack of objective findings in Dr. Bali's notes." [*Id.*]

In her Reply, Plaintiff explains the fault in the ALJ's reasoning. ECF No. 24

at 1–4. During the hearing, in his explanation to the ALJ on his evaluation of Plaintiff's mental impairments, Dr. Enright stated that he read the entire record. [AR 84] Then, he stated that he disregarded Plaintiff's counsel's interview with Dr. Bali as it "looks like some kind of testimony from [Dr. Bali] . . .but that's not a medical record." [*Id.*] Dr. Enright went on to speak about Dr. Bali's treatment notes and explained that sufficient information did not exist that would allow Dr. Enright to "understand the level of severity with regard to functional limitation." [AR 85] Dr. Bali's interview with Plaintiff's counsel could well provide context that would have modified Dr. Enright's analysis of Dr. Bali's medical records.

Since the ALJ gave great weight to Dr. Enright's opinion, but Dr. Enright explicitly did not review a contextual piece of evidence from Dr. Bali, the ALJ must reconsider the weight he gave to Dr. Enright's opinion.

### 4. *Dr. Ricci*

Plaintiff claims that Dr. Ricci's opinion was consistent with Dr. Bali's opinion concerning Plaintiff's mental state. ECF No. 16 at 14–16. Dr. Ricci's examination occurred in December 2016 and the ALJ wrote his decision on October 18, 2016. [AR 20, 45] The Appeals Council rejected Dr. Ricci's opinion because it occurred after the ALJ's decision and as such did "not relate to the period at issue" and did "not affect the decision about whether [Plaintiff was] disabled beginning on or before October 18, 2016." [AR 2] Plaintiff contends that the Appeals Council rationale for rejecting the opinion was improper as it is common that medical testing may occur after a hearing date but relate back to times relevant to the claim. ECF No. 24 at 6.

"[T]he Appeals Council must consider additional evidence offered on administrative review—after which it becomes a part of our record on judicial review—if it is (1) new, (2) material, and (3) related to the period on or before the date of the ALJ's decision." *Krauser v. Astrue*, 638 F.3d 1324, 1328 (10th Cir. 2011) (citing *Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004)). It appears the Appeals Council rejected this evidence because it was not related to the period on or before the date of the ALJ's opinion. [AR 2]

Defendant appears to tacitly admit that I should evaluate the weight given to Dr. Ricci's opinion, even though the Appeals Council discarded it. ECF No. 20 at 17–20. Defendant argues that the new evidence does not change the ALJ's conclusion. ECF No. 20 at 17–20.

Dr. Ricci began his evaluation by thanking Plaintiff's counsel "for the referral of [Plaintiff] for further evaluation of her injury status following assault in September 2009." [AR 20] A review of Dr. Ricci's evaluation shows that it is clearly related to Plaintiff's condition since 2009 and indeed should be included in the record. As such, the ALJ must incorporate this evidence when he reconsiders his decision. *See Krauser v. Astrue*, 638 F.3d at 1328 (whether evidence is "new, material and chronologically pertinent" is a question of law subject to *de novo* review).

### B. Plaintiff's credibility determination

Plaintiff alleges that the ALJ improperly assessed the consistency of Plaintiff's statements as compared to the record. ECF No. 16 at 27–30. She argues that the ALJ did not provide sufficient explanation of the credibility determination

he made and that a lack of evidence of malingering means that Plaintiff should not be considered able to perform sedentary work. *Id.*

Credibility determinations are particularly suited to the finder of fact and must be supported by substantial evidence. *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010). "An ALJ must consider such factors as a claimant's daily activities; attempts to find relief; the type, effectiveness and side effects of medication; and factors that precipitate and aggravate the symptoms." *Watts v. Berryhill*, 705 F. App'x 759, 763 (10th Cir. 2017) (citing *Hamlin v. Barnhart*, 365 F.3d 1208, 1220 (10th Cir. 2004)) (unpublished).

Under SSR 16-3p, the ALJ should consider objective medical evidence and other evidence including the individual's statements, medical and non-medical sources, and a variety of factors to consider the intensity, persistence, and limiting effects of the claimant's symptoms. 2016 WL 1119029, at *4–7 (Mar. 16, 2016). The ALJ need not recite a formalistic factor-by-factor recitation of the evidence, but must merely set forth the specific evidence he relies upon in evaluating the claimant's credibility. *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

Here, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." [AR 41]

As I am remanding this case for the ALJ to reconsider the weight of opinions

on which he relied, the ALJ must additionally reassess Plaintiff's credibility in light of the weight he assigns to the medical opinions.

## VI. CONCLUSION

For the above reasons, SSA's decision is REVERSED, and this case is REMANDED for proceedings consistent with this opinion. The ALJ must: (1) reconsider the weight he gave to Dr. Bali's opinion; (2) reconsider the medical evidence regarding the weight given to Mr. Knauf's statement; (3) reconsider the weight he gave to Dr. Enright's opinion; (4) incorporate Dr. Ricci's evaluation in his decision; and (5) reconsider his determination of Plaintiff's credibility.

Dated: January 24, 2019, in Denver, Colorado.

BY THE COURT:

s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE